**H. E. BUTT GROCERY COMPANY,**
Appellant,

v.

**Juanita DAVIS et vir, Appellees.**

No. 11738.

Court of Civil Appeals of Texas,
Austin.

Feb. 18, 1970.

Clark, Thomas, Harris, Denius & Winters, John Coates, E. Barham Bratton, Barry Bishop, Austin, for appellant.

Maurice Angly, Jr., Austin, for appellees.

HUGHES, Justice.

This is a venue case. Juanita Davis and husband Morris C. Davis, sued H. E. Butt Grocery Company, a corporation, for damages for injuries allegedly sustained by Mrs. Davis as a result of her detention and search by employes of appellant. A plea of privilege was filed by appellant requesting transfer of the suit to Nueces County, the county of its residence and the county in which its principal place of business was located.

Thereafter, April 22, 1969, appellees filed an amended original petition in which Linda Toll and Carl Wayne Smith[1] were added as defendants. On the same day Mrs. Davis filed her affidavit controverting appellant's plea of privilege.

Mrs. Davis, in her controverting affidavit, did not incorporate the allegations of her original or amended petitions in toto. She did, however, incorporate certain portions of both such petitions in her affida-

1. Earl Dean Smith testified and apparently is the person involved.

vit, the pertinent portions of which we quote:

"Your Plaintiff would respectfully show that the taking of her handbag from her was under such circumstances that the same constituted and was an assault upon her. * * *

Your Plaintiff would show that her sack was taken from her under such circumstances that the same constituted and was an assault upon her. * * *

When they arrived in the stock room Defendant Carl Smith in a loud voice ordered Mrs. Davis to 'Let me look in the sack.' Your Plaintiff asked, 'What sack?' And at that point Defendant Carl Smith took Mrs. Davis's large sack from her and sat it out on a counter in the stock room. Your Plaintiff would show that her sack was taken from her under circumstances such that the same constituted and was an assault upon her. * * *

Your Plaintiff would respectfully show that the taking of her handbag was under circumstances such that the same constituted and was an assault upon her."

This assault was stated to have occurred in Travis County.

Mrs. Davis also states in her controverting affidavit that Linda Toll and Carl Wayne Smith were employes of H. E. Butt Company and that she believed them to be residents of Travis County.

Under these facts, Mrs. Davis alleged that venue was properly laid in Travis County under subdivision 9 of Art. 1995, Vernon's Ann.Tex.Civ.St. She also asserted that since at least one of the defendants, Linda Toll, was a resident of Travis County that venue was properly laid in such county. She also sought to maintain venue in Travis County under sub. 3 of Art. 1995 on the ground that the residence of one defendant, Smith, was unknown.

The Trial Court overruled appellant's plea of privilege.

■ It is our opinion that the evidence is sufficient to sustain the implied finding of the Trial Court that appellant or its agents committed a "trespass" in Travis County, within the meaning of sub. 9, Art. 1995, resulting in injury to Mrs. Davis.

The testimony of Miss Toll, appellant's employe, is that her fellow employe, Mr. Smith, indicated to her that he felt Mrs. Davis had been shoplifting. Both employes followed Mrs. Davis outside the H.E.B. store in Hancock Center and Mr. Smith asked Mrs. Davis to return to the store. Mrs. Davis returned to the store and was taken to a storeroom in the back where the bag and purse she was carrying were searched.

Mr. Earl Dean Smith testified that he was employed by H.E.B. on the occasion in question and that he participated in the events leading to the search of the bag and purse of Mrs. Davis. Although he testified that he believed that the Christmas lights found in the bag Mrs. Davis was carrying were from appellant's store he did not testify to any facts which led him to believe that Mrs. Davis was shoplifting.

Mrs. Davis testified that she was employed by the Central Intelligence Agency and had a top-secret security clearance, and that she had never before been accused of shoplifting. We quote from the testimony of Mrs. Davis:

"Q  Mrs. Davis, where did you buy the lights in question?

A  I bought them at the Winn's store on Guadalupe.

Q  I believe it's a part of the deposition, but did you have a receipt which was found later in your billfold from Winn's store covering that purchase?

A  Yes, sir, I had a receipt at the time. * * *

Q You tell us what happened, as best you can remember it.

A Mr. Smith came out on the sidewalk and he said—he called me and I heard him the first time, but not having seen anyone that I knew, I didn't think he was calling me and I continued to walk at a normal pace. I heard him say again, 'Ma'am,' and I turned around and asked him if he was speaking to me. He said, 'Will you step back into the store?' My first thought was that I had dropped something or left something in the store, and I went back with him. I got inside the store and paused to see what he wanted and he said, 'Follow me.' I started following him well on into the store and Miss Toll was with him, and I looked over at Miss Toll and said, 'What does he want?' And she said, 'Follow him.' She did not say please. * * *

A I followed them on into the back of the store, and before I knew it, I was through the door back into the storeroom there, they had described. Mr. Smith asked me what I had in the sack and I asked him what sack. In the meantime, I had bought a large sack of groceries and had checked out and had given a check for my groceries. He asked me to set the big sack down and I set it over on the counter. He said, 'What do you have in the sack?' I said, 'What sack?' I had my tote bag on my arm and this brown paper sack with the lights in my hand.

Q When you say 'tote bag,' is that your purse?

A Yes, sir. I said, 'What bag?' And he said, 'The bag you have in your hand.' And he grabbed ahold of it.

Q In other words, you did not hand—

A I did not hand him that bag.

Q Did you still have a grip on it where you would have held—

A I still had a grip on it when he took it away from me. He went through the bag, the paper bag, and I don't remember if he laid it aside or held onto it, and he said, 'Let me see your purse.' And he reached for my purse and had the bottom part of my purse and he pulled it off of my arm. I would not have given him my purse. I don't hand my purse over to people.

Q In other words, he reached out and took the—

A He reached out and took my purse off of my arm.

Q Did he use any terrific amount of force, or did he just take it off of your arm?

A He took it off of my arm in such a way that it pulled completely off of my arm.

Q Is there any way on earth that Miss Toll could have viewed that as your having handed it to him?

A I don't see how she could have.

Q All right. What did he do after he took your purse, tote bag?

A He held onto it. It's one of the types that has a zipper through the center section and it's open on both sides. He took the tote bag and just went through it like this (indicating) with his hands. I guess he wasn't satisfied because he laid it over on the counter and laid it down and started pulling the stuff out of it. * * *

Q After he went through the contents of your bag, what did he do? You said he was looking through it and

then he set it somewhere and then what did he do?

A He pulled it back up and set it on the counter. He never did hand it back to me. I had to reach over there and take it. Then he picked up the little brown paper bag and said, 'I'll be back in a minute,' and walked out. I looked over at Miss Toll and said, 'What is all this about?' She blushed again and shrugged her shoulders and said, 'I don't know.'

Q Did he ask you at any time if he could look in your purse or did he just say let me have that?

A No, sir, he did not ask to look in my purse. He just took it and started going through it first with his hands.

Q And that was after he pulled it off of your arm?

A Yes, sir.

Q Did you, after you got home and what have you, have any problems that occurred from this interrogation and having your purse taken away from you and what have you?

A Yes, sir.

Q What was that?

A Well, I really don't know how I ever got home. I went to pieces when I got in the car. I sat there and shook and cried for a little bit. I finally got the car started up and got home. When I got home, of course it was dark by this time, and my husband was getting worried. When I walked into the house, he kind of laughingly joked and said somthing about that it was about time, and he had no more than said this when he looked at me and realized something was wrong. He said, 'What in the world is the matter with you?' And I started crying

and shaking and I couldn't answer him. He finally got me sat down there in a chair and he said, 'What has happened?' I said, 'Well, I really don't know. I guess you would say that I've been accused of shoplifting.'

Q From their actions towards you and the way they had addressed you and everything else, was their entire manner accusatory rather than polite?

A Well, yes, sir.

Q Could you tell me whether or not as a result of this nervousness that you have described to us you later had to see a doctor?

A Yes, sir.

Q And was this to be treated for a case of hives that you broke out with?

A Yes, sir.

Q And has the doctor told you that this was the result of the extreme nervousness that you experienced?

A Yes, he did.

Q And did you have various medical bills, about forty-six dollars worth of medical bills, to treat those hives and also to calm you down and prevent headaches and what have you and the other aspects of it?

A Yes, sir."

The record also shows that Mr. Smith searched Mrs. Davis' coat.

Mr. Smith testified that during the search:

"A I noticed Mrs. Davis—at the time I did not know her name, in fact, I did not know her name until I received the suit. I didn't inquire at all. When I got back into the room, I noticed that Mrs. Davis was getting nervous and upset, and

at this time with any lady, possibly because I try to be a gentleman or try to be nice about these things, I told Mrs. Davis to go ahead and go and take the lights with her and I apologized on behalf of H. E. Butt Corporation."

Appellant relies primarily on the provisions of Secs. 2 and 3, Art. 1436e, Vernon's Ann.P.C., to justify its conduct. These Sections provide:

"Sec. 2. All persons have a right to prevent the consequences of shoplifting by seizing any goods, edible meat or other corporeal property which has been so taken, and bringing it, with the supposed offender, if he can be taken, before a magistrate for examination, or delivering the same to a peace officer for that purpose. To justify such seizure, there must, however, be reasonable ground to suppose the crime of shoplifting to have been committed and the property so taken, and the seizure must be openly made and the proceeding had without delay.

### Detention of persons

Sec. 3. Any merchant, his agent or employee, who has reasonable ground to believe that a person has wrongfully taken or has wrongful possession of merchandise, may detain such person in a reasonable manner and for a reasonable length of time for the purpose of investigating the ownership of such merchandise. Such reasonable detention shall not constitute an arrest nor shall it render the merchant, his agent or employee, liable to the person detained."

We need not determine whether reliance on this statute by appellant is in the nature of a defense determinable only in a trial on the merits and not relevant to a venue proceeding[2] for the reason that, as demonstrated herein, there is no evidence to show that appellant had "reasonable ground to

suppose the crime of shoplifting to have been committed" and there is no evidence to show that appellant had "reasonable ground to believe" that Mrs. Davis had "wrongfully taken" or had "wrongful possession" of merchandise belonging to it.

■ Appellant quotes from Appellees' First Amended Original Petition allegations which it relies upon to establish justification for the detention and search of Mrs. Davis. These allegations were not offered in evidence and they do not come within the rule that current pleadings need not and should not be introduced in evidence in order that they may have probative value. The reason is that in venue proceedings the pleadings consist of the plea of privilege and the controverting affidavit. Harris v. Gregory, 23 S.W.2d 748, Tex.Civ.App., Fort Worth, no writ (1929); Christian v. Universal Credit Co., 63 S.W.2d 229, Tex.Civ.App., Dallas, writ dismissed (1933); Alley v. Ponca Wholesale Mercantile Company, 360 S.W.2d 870, Tex.Civ.App., Amarillo, no writ (1962).

We are also of the opinion that the acts and conduct of appellant and its employes constituted a "trespass" within the meaning of sub. 9, Art. 1995.

The leading authority on the question is Hill v. Kimball, 76 Tex. 210, 13 S.W. 59, 7 L.R.A. 618 (1890). In that case it was held that the defendant, knowing plaintiff was *enciente*, frightened her by engaging in a brawl with two men, resulting in a miscarriage by plaintiff, was a "trespass" under the venue statutes. This case was followed by this Court in First National Bank v. Childs, 231 S.W. 807, writ ref. (1921). In this latter case the wrongs alleged were that plaintiff was threatened with criminal prosecution. We quote from the opinion in that case:

"It is claimed by appellant that no offense or trespass was alleged by plaintiff within the meaning of the venue

2. Austin Road Co. v. Anderson, 146 Tex. 553, 209 S.W.2d 595 (1948); Dealers National Insurance Co. v. Rose, 396 S.W.2d 535, Tex.Civ.App., Waco, no writ (1965).

statute; and also that no cause of action in whole or in part arising in McLennan county was alleged. As to the first of these contentions, we are strongly inclined to the view that this is a case of trespass under the doctrine announced by the Supreme Court in Hill v. Kimball, 76 Tex. 210, 13 S.W. 59, 7 L.R.A. 618. It is true that the court, in the later case of Ricker v. Shoemaker, 81 Tex. 22, 16 S.W. 645, qualified the former case in respect to certain expressions therein. Nevertheless, Mr. Justice Gaines, speaking for the court in the Ricker Case, stated that:

'The words "when the crime, offense, or trespass was committed" indicate that the word trespass was intended to embrace only actions for such injuries as result from wrongful acts willfully or negligently committed, and not those which result from a mere omission to do a duty.'

The holding was that a mere negligent omission would not constitute a trespass. Here the petition alleges no mere negligence, but acts claimed to have been committed wantonly and deliberately, resulting in the impairment of plaintiff's health and in physical injuries. It is not believed that the authorities in this state justify appellant's contention that force is a necessary element in a trespass case."

Childs has been followed in a recent case by the Fort Worth Court of Civil Appeals, Safeway Stores, Inc. v. Amburn, 380 S.W.2d 727, writ dismissed (1964). In that case threats of criminal prosecution were held to constitute a "trespass" for venue purposes.

In this case Miss Toll testified:

"Q Would you say that it was reasonably made clear by the statements to Mrs. Davis that she was suspected of shoplifting?

A Yes.

Q If you had been Mrs. Davis, from the actions of yourself and Mr. Smith, would it have been clear that the entire course of conduct was in the nature of investigating the possible shoplifting?

A Yes."

 We hold that under the facts before us the implied finding of the Trial Court that Mrs. Davis was wrongfully subjected to search of her shopping bag, purse and coat showed an active, deliberate tort by appellant and its employes sufficient to constitute a trespass within the meaning of sub. 9, Art. 1995.

Since appellant is a private corporation, venue in Travis County was also proper under sub. 23, Art. 1995.

The judgment of the Trial Court is affirmed.

Affirmed.